IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| GEORGE S. BRODY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR VIOLATION** |
| | ) | **OF THE FEDERAL** |
| JERRY L. WINCHESTER, DOUGLAS | ) | **SECURITIES LAWS AND FOR** |
| SWANSON, K. KIRK KIRST, W. RICHARD | ) | **VIOLATION OF STATE LAW** |
| ANDERSON, ROBERT HERLINE, EDWARD | ) | **BREACHES OF FIDUCIARY** |
| DIPAOLO, ROBERT CROYLE,   BOOTS & | ) | **DUTY** |
| COOTS, INC.,  HALLIBURTON COMPANY, | ) | |
| and GRADIENT, LLC., | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

**INTRODUCTION**

Plaintiff, by his attorneys, alleges the following upon information and belief, except for those allegations that pertain to plaintiff and his attorneys, which allegations are based on personal knowledge.   Plaintiff's information and belief is based on, *inter alia*, the investigation conducted by his attorneys, including a review of the public filings of defendant Boots & Coots, Inc.  ("Boots" or the "Company"), press releases, news articles and publicly available information concerning Boots.

**SUMMARY OF THE ACTION**

1.   Plaintiff brings this action seeking equitable relief for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9"), breaches of fiduciary duty and other violations of state law in connection with a proposed transaction whereby the Company and Halliburton Company ("Halliburton") entered into an Agreement and Plan of Merger (the "Merger Agreement"), dated as of April 9, 2010, whereby Boots will be sold to Halliburton and Boots'

shareholders will receive $3.00 per share for each share of the Company's common stock they hold, comprised of $1.73 in cash and $1.27 in Halliburton common stock (the "Exchange Ratio"), representing a meager 26% premium representing an initial deal value of approximately $232 million (the "Merger" or "Proposed Transaction").

2.     The Proposed Transaction is at a grossly inadequate and unfair price and was arrived at without any auction or market check.  The only other unsolicited offer that the Company received from Company A, a public company that offered a stock for stock transaction, was immediately dismissed by the Board for not being as strong as Halliburton's offer.  The Proposed Transaction was arrived at by an unfair and tainted process that was intended to provide valuable assets of Boots to Halliburton for unfair and inadequate consideration.  Defendants have acted together, in concert, or in conspiracy to the detriment of the Company and in breach of the Director Defendants' fiduciary duties to Boots.

3.     Plaintiff seeks to enjoin consummation of the Merger and completion of the Proposed Transaction under the grossly inadequate and unfair implied price of $3.00 per share.  Alternatively, in the event that the Merger is consummated, plaintiff seeks to recover damages resulting from Defendants' breaches of their fiduciary duties owed Boots shareholders and for the misleading disclosures made in Boot's proxy materials.  The Merger and the acts of the Director Defendants, as more particularly alleged herein, constitute a breach of defendants' fiduciary duties to Boots and violations of the federal securities laws and other applicable legal standards governing the defendants herein.

4.     Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, defendants agreed to: (i) a no-solicitation provision that prevents other buyers from having access to the Company's confidential information (which is necessary to formulate a bid), except under

extremely limited circumstances; (ii) a matching rights provision that allows Halliburton 5 days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay Halliburton a termination fee of $10,000,000 and reimburse Halliburton's transaction expenses up to $1,500,000.  These provisions substantially limit the Board of Director's ability to act with respect to investigating and pursing superior proposals and alternatives including a sale of all or part of Boots.

5.      The Director Defendants' action in proceeding with the Proposed Transaction is wrongful, unfair, and harmful to Boots's public stockholders, and will deny them their right to share proportionately in the true value of Boots's future growth in profits and earnings.

6.      The Director Defendants have breached their fiduciary duties to Boots shareholders by causing the Company to enter into the Merger Agreement that provides for the sale of Boots at an unfair price, and deprives Boots's public shareholders of maximum value to which they are entitled.

7.      Finally, on May 7, 2010, Halliburton filed a Form S-4 Registration Statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction pursuant to which, *inter alia,* the Boots Board of Directors (the "Board") recommended that Boots stockholders vote "FOR" the approval and adoption of the Merger Agreement and in favor of the Proposed Transaction.  In connection with the Registration Statement, Director Defendants have violated Rule 14a-9 and breached their duty of candor by failing to disclose material information to Boots shareholders necessary for them to determine whether to vote in favor of the Proposed Transaction.

**JURISDICTION AND VENUE**

8.      The claims asserted herein arise under Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Delaware common law.  This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331. The Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, Boots maintains its principal executive offices in Texas.

**THE PARTIES**

10.      Plaintiff has been the owner of common stock of since prior to the transaction herein complained of and continuously to date.

11.      Defendant Boots, a Delaware corporation, with its principal offices located at 7908 North Sam Houston Parkway West, 5th Floor, Houston, Texas 77064, provides a suite of integrated pressure control and related services to onshore and offshore oil and gas exploration and development companies principally in North America, Asia, North Africa, South America, West Africa and the Middle East.  Its customers include independent oil and gas companies in the United States market, and international and foreign national oil and gas producers, as well as other oilfield service companies.  The Company's service lines are organized into three business segments: Pressure Control, Well Intervention and Equipment Services.  On February 10, 2009, the Company acquired John Wright Company, which provides a suite of relief well drilling and risk management services to the oil and gas industry worldwide.  The Company was formerly known as Boots & Coots International Well Control, Inc. and changed its name to Boots & Coots, Inc. in May 2009.  Boots was founded in 1988.

4

12.     Defendant Douglas E. Swanson ("Swanson") has served as a director of the Company since 2006. Defendant is a director of Oil States International, Inc., a diversified oilfield services company, and a leading manufacturer of products for deepwater production facilities and subsea pipelines. Swanson is a director for Flint Energy Services, LTD a Canadian integrated midstream oil and gas production services provider.

13.     Defendant Jerry Winchester ("Winchester") has served as President and director of the Company since 1998. In 2002, he assumed the position of Chief Executive Officer. Defendant is an active member of the Society of Petroleum Engineers and the International Association of Drilling Contractors. Prior to joining the Company in 1998, Winchester was employed by Halliburton Energy Services since 1981 in positions of increasing responsibility, most recently as Global Manager - Well Control, Coil Tubing and Special Services.

14.     Defendant K. Kirk Krist ("Krist") has served as a director since the Company's acquisition of IWC Services on July 29, 1997. He serves on the Nominating & Corporate Governance Committee. Defendant Krist has been a self-employed oil and natural gas investor and venture capitalist since 1982.

15.     Defendant Robert S. Herlin ("Herlin") has been a director of the Company since 2003. Herlin serves on the Audit Committee and chairs the Compensation Committee. Since 2003, Defendant Herlin has served as the President, CEO and a Director of Evolution Petroleum Corporation, a public company involved in the acquisition and redevelopment of oil and gas properties. Herlin was elected Chairman of the Board of Directors of Evolution in 2009. Since 2003, Herlin has served as a partner with Tatum Partners, a service company that provides principal executive and accounting officers to clients on a contract basis.

16.     Defendant W. Richard Anderson ("Anderson") has served as a director of the Company since 1999. Anderson also serves as chairman of the Audit Committee and is a

5

member of the Compensation Committee.  He is currently the Chief Financial Officer for Eurasia Drilling Company Limited, the largest land drilling company in Russia.  Defendant Anderson also serves on the boards of directors of Transocean Ltd.  and Vanguard Natural Resources, LLC.

17.     Defendant E.  J.  DiPaolo ("DiPaolo") has served as a director of the Company since 2003.  DiPaolo also serves on the Audit, Compensation, and Nominating & Corporate Governance Committees.  He has provided consulting services to Growth Capital Partners, L.P., a company engaged in investments and merchant banking since 2003.  He also serves on the boards of directors of Superior Well Services, Inc., Evolution Petroleum Corporation, and Innicor Subsurface Technologies, Inc.  DiPaolo was the Senior Vice President, Global Business Development of Halliburton Energy Services, having had responsibility for all worldwide business development activities until his retirement in 2002.  Defendant DiPaolo was employed at Halliburton Energy Services from 1976 until his retirement in progressive positions of responsibility.

18.     Defendant Robert G.  Croyle ("Croyle") has served as a director of the Company since 2007.  He chairs the Nominating & Corporate Governance Committee. Croyle is a director of Rowan Companies, Inc.  and Magellan Midstream Holdings, GP, LLC.

19.     The individual defendants named in paragraphs 14-20 above are all collectively referred to herein as the "Director Defendants."

20.     Halliburton, a Delaware corporation, together with its subsidiaries, provides various products and services to the energy industry for the exploration, development, and production of oil and natural gas worldwide.  It operates in two segments, Completion and Production, and Drilling and Evaluation.  Halliburton serves national, integrated, and independent oil and gas companies.  Halliburton was founded in 1919 and is headquartered in Houston, Texas.

6

21. Gradient, LLC ("Merger Sub"), a Delaware corporation and a wholly owned subsidiary of Halliburton, was organized for the sole purpose of completing the Merger.

22. Defendants Halliburton and Merger Sub are collectively referred to as "Halliburton."

23. Boots, the Director Defendants and Halliburton are collectively referred to herein as "Defendants."

24. The Director Defendants owe fiduciary duties, including the highest obligations of good faith, loyalty, fair dealing, due care, and full candor to Boots and its shareholders.

25. The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

26. Each Director Defendant herein is sued individually as a conspirator and aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## SUBSTANTIVE ALLEGATIONS

### Boots Is Positioned For a Promising Future

27. Boots provides a suite of integrated pressure control and related services to onshore and offshore oil and gas exploration and development companies in North America, Asia, North Africa, South America, West Africa and the Middle East. The Company's service lines are organized into three business segments: Pressure Control, Well Intervention and Equipment Services.

7

28.    The Company's Pressure Control segment includes prevention and risk management services, including their Safeguard programs, that are designed to promote more efficient and safe oil and gas production procedures and reduce the number and severity of critical events such as oil and gas well fires, blowouts or other incidences due to loss of control at the well, and personnel, equipment and emergency services utilized during a critical well event. As described in the Company's Annual Report filed on March 3, 2010 (the "Annual Report"), this segment is designed to provide a "consistent income stream" and has significantly expanded since its origination in 1999.  As stated in the Annual Report:

> Due to the predictability of a critical event, in 1999 we began to offer prevention and risk management services in an effort to provide a more consistent income stream. These services began with the introduction of our "Safeguard" prevention and risk management contract services in Alaska. We expanded these services into Venezuela in late 1999 and into Algeria in 2001. The Safeguard operations in Algeria were significantly expanded in 2004 when we entered into new long-term contracts with Algeria's national oil and gas company, Sonatrach, and ENSP, one of the Algeria national oil and gas service providers. We also expanded into India in 2004, working for the Oil and Natural Gas Commission of India. In 2008 we entered Libya and significantly expanded those services in 2009 under a renewed multi-year Safeguard contract.

29.    The Company's Well Intervention segment includes services that are designed to enhance production for oil and gas operators and consists primarily of snubbing and hydraulic workover services.   As described in the Annual Report, this segment has successfully positioned themselves to benefit significantly in the future as demand for natural gas rises:

> In the long-term, demand for natural gas is expected to rise, driven by its cleaner burning properties, lesser environmental impact, lower cost and greater availability when compared to oil. Investments in LNG infrastructure have transformed natural gas from a regional resource to a commodity that is readily traded and transported globally, increasing its commercial value in underdeveloped and emerging markets of West Africa, South America, Southeast Asia and the Middle

East. ***We expect to benefit from increased international gas drilling*** as these wells typically have higher wellbore pressure and require snubbing/hydraulic services. While domestic natural gas drilling activity contracted during 2009, the active domestic drilling rig count began increasing towards the end of the year and the Haynesville, Fayetteville and Marcellus shale plays, among others, continue to experience substantial ongoing drilling. ***We have successfully positioned a significant portion of our domestic operations and assets to service and participate in these plays***.

(*Emphasis added*).

30.     The Company's Equipment Services segment consists primarily of pressure control equipment rentals and services, designed for safer and more efficient production under high pressure and high temperature situations. This business is currently operating in the Gulf Coast and Central and East Texas regions. The Company plans to expand this business into other operating areas where it provides Well Intervention services such as in the Rockies, North Texas and Oklahoma, and international markets.

31.     On January 6, 2010, Boots announced that it has been awarded a new secure and salvage project under its Safeguard contract with the Oil and Natural Gas Corporation of India ("ONGC"). The operation consists of recovering a subsea blowout preventer (BOP) stack in approximately 740 feet of water under 6000 psi of pressure. As stated by Defendant Winchester, the Company's CEO, "We are very excited to work with ONGC again after our successful secure and salvage operation last year…We appreciate the trust ONGC has shown by awarding us this opportunity and we look forward to continuing to solidify a long relationship as we work together on this and other projects.'"

32.     On March 2, 2010, the Company announced its financial results for the fourth quarter of 2009. Specifically, the press release stated:

> HOUSTON--(BUSINESS WIRE)--Boots & Coots, Inc. (NYSE: WEL - News), announced revenues of $53.0 million for the quarter ended December 31, 2009 compared to $55.9 million for the same quarter of 2008. Net income for the quarter was $2.5 million or

9

$0.03 per diluted share, compared to $5.1 million or $0.07 per diluted share for the 2008 fourth quarter. EBITDA (earnings before interest, income taxes, depreciation and amortization; see the reconciliation and rationale for this non-GAAP financial measure below) was $6.8 million or 12.8% of revenues for the quarter, compared to $9.8 million or 17.6% of revenues for the fourth quarter of 2008.

For the year ended December 31, 2009, Boots & Coots reported revenues of $195.1 million compared to $209.2 million for 2008. Net income for the 2009 period was $6.0 million or $0.08 per diluted share, compared to $21.8 million or $0.28 per diluted share for the prior year. EBITDA was $25.3 million for the year ended December 31, 2009 compared to $39.1 million for 2008.

*"Year over year, revenues were down only 7% and we remained profitable despite nearly a 50% drop in domestic rig count from its 2008 high and the worldwide recession. We believe these results are a tremendous contrast relative to our peers and are due in large part to our global geographic diversity and the manner in which we deliver our products and services. Our focus continues to be broadening our international reach while continuing to focus on unconventional gas in North America and abroad," said Jerry Winchester, chief executive officer of Boots & Coots. "Our markets appear to be mostly rebounding from the lows experienced in the third quarter of 2009, and our international diversification and focus on shale plays in the U.S. make us very well positioned for growth as market conditions improve."*

"We continue to expand operations in North Africa and have developed an increasing presence in Southeast Asia. We recently announced a new secure and salvage project with ONGC, which is our third project in India," concluded Mr. Winchester. "In 2010, we look forward to continuing our business development efforts in Africa, Asia and South America."
*(Emphasis added.)*

33.   While revenues were down 7% from the same period in 2008, defendant Winchester attributed the decrease to the worldwide recession and "lows experienced in [the Company's] market in the third quarter of 2009." However, as stated by Winchester, "these

results are a tremendous contrast relative to [the Company's] peers and are due in large part to [the Company's] global geographic diversity and the manner in which [the Company] deliver[s] our products and services." In addition, Winchester stated, the Company's markets "***appear to be mostly rebounding*** from the lows experienced in the third quarter of 2009, and [the Company's] international diversification and focus on shale plays in the U.S. ***make us very well positioned for growth as market conditions improve***." (*Emphasis added*).

34. Defendant Winchester also commented on the Company's recent expansion efforts stating: "We continue to expand operations in North Africa and have developed an increasing presence in Southeast Asia. We recently announced a new secure and salvage project with ONGC, which is our third project in India…In 2010, we look forward to continuing our business development efforts in Africa, Asia and South America."

**The Merger**

35. On April 9, 2010, Halliburton and Boots issued a press release announcing the execution of the Merger Agreement. That release provided in relevant part:

> HOUSTON--(BUSINESS WIRE)--Halliburton (NYSE: HAL - News) and Boots & Coots (NYSE Amex: WEL) jointly announced today that Halliburton has entered into a definitive merger agreement to acquire all of the outstanding stock of Boots & Coots in a stock and cash transaction.
>
> Marc Edwards, Halliburton's Senior Vice President of Completion and Production, said, "Optimizing economic production levels in both mature assets and unconventional gas resources requires increasing levels of pressure control and well intervention. The combination of Halliburton's global hydraulic workover and coiled tubing deployed technologies, together with Boots & Coots' well intervention and pressure control services will help us improve full life cycle returns for our customers. This is a natural addition to Halliburton's extensive completion and production enhancement portfolio, further enabling integrated project workflows with improved reservoir recoveries."
>
> Following completion of the transaction, a new product service line within Halliburton will be created to include Halliburton's existing

11

coiled tubing and hydraulic workover operations and Boots & Coots' intervention services and pressure control business. Boots & Coots' management will be retained to lead Halliburton's Boots & Coots product service line with operating results reported through Halliburton's Completion and Production reporting segment. Halliburton expects the acquisition to be accretive in the first full year of operation.

Under the merger agreement, Boots & Coots stockholders will receive $3.00 per share for each share of Boots & Coots common stock they hold, comprised of $1.73 in cash and $1.27 in Halliburton common stock, subject to election, proration features and an exchange ratio based on Halliburton's five-day average share price prior to closing as further described in the merger agreement. The Boards of Directors of both Halliburton and Boots & Coots have approved the transaction, which is expected to close in the summer of 2010, subject to regulatory approvals, approval by Boots & Coots' stockholders and other conditions.

"Halliburton's legacy of innovation coupled with its integrated service capability complement Boots & Coots' focus on delivering a complete portfolio of pressure control and well intervention services," said Jerry Winchester, Boots & Coots President and Chief Executive Officer. "Combining the resources of both companies creates the premier intervention company across the globe."

36. Pursuant to the Merger Agreement, Boots stockholders will receive $3.00 per share for each share of Boots common stock they hold, comprised of $1.73 in cash and $1.27 in Halliburton common stock.

37. The recent historical averages for Boots's stock price demonstrate that the consideration being offered by Halliburton is unfair and inadequate. Indeed, Halliburton is taking advantage of Boots at a time when it is executing its plan successfully. In September 2008, the Company's stock price traded over $3.00 per share. The Company's stock price was poised to climb over $3.00 per share again. In fact, the Company had consistently outperformed the Standard & Poors' 500, the PHLX Oil Service Sector and the DJ Wilshire MicroCap Oil Equipment & Services over the past five years, as demonstrated in the chart:

12



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN***
Among Boots & Coots, Inc., The S&P 500 Index,
The PHLX Oil Service Sector Index And DJ US MicroCap Oil Equipment & Services Total Stock Market

— □ — Boots & Coots, Inc.
— △ — S&P 500
· · ⊙ · · PHLX Oil Service Sector
— ✳ — DJ US MicroCap Oil Equipment & Services Total Stock Market

*$100 invested on 12/31/04 in stock or index, including reinvestment of dividends.
Fiscal year ending December 31.

Copyright© 2010 S&P, a division of The McGraw-Hill Companies Inc. All rights reserved.

38.    Further, two Wall Street analysts had price targets of $3.50 and $3.20 per share, respectively, before the Proposed Transaction was announced.  For example, on March 31 2010, Boots' target was raised to $3.50 from $2.50 at Wunderlich.  Wunderlich raised its target to $3.50 from $2.50 to reflect increased international forecasts and maintains a Buy rating on the stock.

39.    The Proposed Transaction serves no legitimate business purpose of Boots but rather is an attempt by defendants to enable Halliburton to benefit unfairly from the transaction at the expense of Boots's public shareholders. The Proposed Transaction will, for a grossly inadequate consideration, deny plaintiff his right to share proportionately in the

13

future success of Boots and its valuable assets, while permitting Halliburton to reap huge benefits from the transaction.

40.     While the Company was poised for growth, Halliburton, on the other hand, had been performing poorly.  On January 28, 2010, Halliburton announced its results for the full year 2009.  Halliburton's revenue reportedly was $14.7 billion for the full year 2009, *a decrease of 20%* from the full year 2008, and its operating income was $2.0 billion, *a decrease of 50%* from the full year 2008. Income from continuing operations for the full year 2009 was $1.2 billion, or $1.28 per diluted share, compared to 2008 income from continuing operations of $2.6 billion, or $2.91 per diluted share.

41.     Given the Company's future prospects and recent performance, the consideration shareholders are to receive is inadequate.  Halliburton is picking up Boots at the most opportune time -- when Boots & Coots is poised for growth and its stock price is trading at a huge discount to its intrinsic value.

### The Director Defendants' Material Conflicts

42.     Each of the Director Defendants have clear and material conflicts of interest and will receive financial benefits as a result of the Proposed Transaction.  Pursuant to the Merger Agreement, each outstanding award of Boots restricted stock will become fully vested, and each holder will have the right to make the same elections as a holder of Boots common stock.

43.     The following table sets forth information concerning options and SARs relating to Boots common stock and restricted stock held by the Director Defendants as of May 5, 2010.

| Name | Stock Options & SARs | | | Restricted Stock | |
|---|---|---|---|---|---|
| | Number of Shares of Underlying Unexercised Options | Exercise Price ($) | Value of Options & SARs | Number of Unvested Shares of Restricted Stock | Value of Shares of Restricted Stock |

| Jerry L. Winchester | 500,000 | $1.20 | $900,000 | 718,038 | $2,154,114 |
|---|---|---|---|---|---|
|  | 150,000 | $2.58 | $63000 |  |  |
| Dewitt H. Edwards | 300,000 | $1.13 | $561,000 | 404,726 | $1,214,178 |
|  | 120,000 | $1.71 | $154,800 |  |  |
|  | 100,000 | $2.58 | $42,000 |  |  |
| Cary Baetz | --- | --- | --- | 376,934 | $1,130,802 |
| Douglas Swanson | --- | --- | --- | 31,250 | $93,750 |
| Robert Croyle | --- | --- | --- | 31,250 | $93,750 |
| K. Kirk Krist | --- | --- | --- | 31,250 | $93,750 |
| Richard Anderson | --- | --- | --- | 31,250 | $93,750 |
| Robert Herlin | --- | --- | --- | 31,250 | $93,750 |
| E.J. DiPaolo | 3,750 | $0.92 | $7,800 | 31,250 | $93,750 |

44.    Each of defendants Winchester and Edwards has entered into an executive agreement with Halliburton that will become effective at the time of the closing of the merger.

45.    Pursuant to an executive agreement, defendant Winchester will serve as Vice President, Product Service Line of Halliburton.  Defendant Winchester will receive an initial annual base salary of $300,000, which may be increased thereafter.  In addition, defendant Winchester will be granted (i) a merger closing award of 45,000 shares of Halliburton restricted common stock to vest one-third annually over a three-year period, (ii) 5,600 shares of Halliburton restricted common stock to vest one-third annually over a three-year period, and (iii) nonqualified stock options to purchase 6,800 shares of Halliburton common stock to vest one-third annually over a three year period.

46.    Defendant Winchester will be entitled to participate in Halliburton's Annual Performance Pay Plan, or the Performance Pay Plan, for the 2010 plan year, with a maximum payout equal to 90% of annual base salary, and will be nominated for participation in Halliburton's Performance Unit Program for the 2010 cycle, with a maximum payout equal to 90% of annual base salary.

47.     Pursuant to an executive agreement, defendant Edwards will serve as Senior Director, Global Operations of Halliburton.  Defendant Edwards will receive an initial annual base salary of $225,000.  In addition, defendant Edwards will be granted (i) a merger closing award of 26,000 shares of Halliburton restricted common stock to vest one-third annually over a three-year period, (ii) 4,600 shares of Halliburton restricted common stock to vest one-third annually over a three-year period, and (iii) nonqualified stock options to purchase 7,500 shares of Halliburton common stock to vest one-third annually over a three-year period.

48.     Finally, the Proposed Transaction will be treated as a change of control and certain of the Director Defendants will receive million of dollars in change of control benefits.  For example, upon closing of the Merger, defendants Winchester, Edwards and Baetz will receive change of control payments in the amount of $6,215,112, $3,230,786 and $3,140,333, respectively.

49.     As early as January 26, 2010, prior to any agreement on price amongst the parties, discussions concerning employment of management was discussed amongst Boots and Halliburton.  These discussions swayed the Board towards entering the Proposed Transaction.  In fact, the Company failed to perform a market check including negotiations with Company A.  Specifically, the Registration Statement states that:

> With respect to Halliburton, the board considered, among other things, that Halliburton would be able to fund a transaction involving a substantial cash component without having to obtain external financing and that it appeared motivated by a strategic interest in acquiring Boots & Coots *and retaining its management.*
>
> \* \* \*
>
> *Later on March 10, 2010, Baker Botts and Thompson & Knight discussed Halliburton's intention to retain certain officers of Boots & Coots after the closing of the proposed merger and the inclusion of a closing condition to that effect in the merger agreement.*

### The Preclusive Deal Protection Devices

50.     On April 9, 2010, the Company filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement for the Proposed Transaction.  As part of the Merger

Agreement, defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company. By way of example, §5.3 of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by Halliburton. Despite the fact that they have locked up the Company and bound it to not solicit alternative bids, the Merger Agreement provides other ways that guarantee the only suitor will be Halliburton.

51. Pursuant to §5.3 of the Merger Agreement, should an unsolicited bidder arrive on the scene, the Company must notify Halliburton of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, Halliburton is granted five business days to amend the terms of the Merger Agreement to make a counter-offer so that the Board no longer needs to recommend the competing bid as superior. Halliburton is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the unsolicited offer.

52. In other words, the Merger Agreement gives Halliburton access to any rival bidder's information and allows Halliburton a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for Halliburton, because the Merger Agreement unfairly assures that any "auction" will favor Halliburton and piggy-back upon the due diligence of the foreclosed second bidder.

53. In addition, the Merger Agreement provides that a termination fee of $10,000,000 and reimbursement of transaction expenses up to $1,500,000 must be paid to Halliburton by Boots if the Company decides to pursue said other offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

54.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of Halliburton's inadequate offer price.

55.     The terms of the Merger Agreement are structured to ensure that Halliburton, and only Halliburton, ultimately acquires Boots, regardless of whether such terms are designed and/or serve the best interests of shareholders.

56.     The Termination Fee and expense obligation are deterrents to other potential bidders and provide defendants with an unearned windfall at the expense of the Company's public shareholders if a superior bid emerges.

57.     Accordingly, the terms of the Merger Agreement substantially limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of Boots.

The Registration Statement is Materially Misleading and/or Incomplete

58.     On May 7, 2010, Halliburton filed a Form S-4 Registration Statement with the SEC in connection with the Proposed Transaction and seeking, *inter alia*, the approval of Boots shareholders of the Merger Agreement and the transactions contemplated thereby, and "FOR" the adjournment of the Boots special meeting, if necessary, to solicit additional proxies if there are not sufficient votes in favor of the Proposed Transaction.

59.     The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby

18

rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

60.     For example, the Registration Statement completely fails to disclose how the Company arrived at a valuation of $3.00 per share for the Company.  In fact, there is no mention anywhere that the Board even relied upon any financial advisor when determining the $3.00 value for the Company.  Prior to receiving any offer, any discussions or negotiations with Halliburton on price, the Board capped the price of the Company's shares at $3.00 once defendant Winchester, on January 14, 2010, indicated that any proposal would have to represent a premium in excess of 70% (or $2.96) to the current market price of Boots which was then $1.74 per share to be considered seriously despite the discounted value at which Boots common stock traded when compared to its peer group.

61.     The Registration Statement further fails to disclose how the Board derived the $3.00 valuation.  There is no mention if it is based upon the Company's "stand alone" value, contemplates acquisitions or pro forma value with Halliburton etc.

62.     The Registration Statement further fails to disclose the reasons for the dismissal of the only other unsolicited offer that the Company received from Company A, a public company that offered a stock for stock transaction, other than not being as strong a suitor as Halliburton.  It fails to disclose what information the Board had relied upon in making such determination.  Additionally, no information is provided as to whether Company A would retain management.  The lack of discussions with Company A due to their potential need for third party financing would effect a significant portion of potential acquirors:

> With respect to Company A, the board believed, based upon publicly available financial information, *that it would require third party financing to fund a transaction involving a significant cash component, which brought substantial risk and uncertainty to any transaction involving Company A.*

63.     Additionally, the underlying methodologies, projections, key inputs and multiples relied upon and observed by Howard Frazier Barker Elliott, Inc. ("Howard

Frazier"), the Company's financial advisor is also lacking in disclosures since the shareholders can't properly assess the credibility of the various analyses performed by Howard Frazier and relied upon by the Board in recommending the Proposed Transaction. In particular, Boots' management provided Howard Frazier with financial forecasts and estimates which reflected unlevered after tax cash flows reflecting sales, expenses, cash flows, the capital expenditures, income statement and balance sheet items etc. Shareholders must be provided with this information in addition to the forecasts and estimates to properly assess the value of the Proposed Transaction and determine whether the Proposed Transaction is in their best interests.

64. Moreover, the Registration Statement is deficient and should provide, *inter alia*, the following:

i. The financial forecasts prepared by Boot's management, beyond 2012, if any, as well as the adjustments made to it by Boots management, that were relied upon by Howard Frazier in rendering its fairness opinion.

ii. Information as to whether the Boots financial projections include joint ventures and/or acquisitions i.e. Halliburton HWO business or is it merely based upon stand-alone basis.

iii. The criteria used for the selection of comparable companies in the *Selected Companies Analysis*.

iv. The individual multiples and data used for the years 2009 through 2011 for each of the comparable companies in the *Selected Companies Analysis*.

v. What information was used to calculate EBITDA forward multiples in the *Selected Companies Analysis*.

vi. What was the basis for Howard Frazier's selection of enterprise value multiple ranges of 8.00x to 10.00x 2009 EBITDA, 6.75x to 7.50x management's 2010E EBITDA, and 5.25x to 5.75x management's 2011E EBITDA in the *Selected Companies Analysis*.

65.    The Registration Statement is also deficient and should provide, *inter alia*, the following:

>   i.  The criteria used for the selection of comparable companies in the *Selected Transactions Analysis*.
>
>   ii.  The individual multiples used for the years 2009 through 2011 for each of the comparable companies in the *Selected Transactions Analysis*.
>
>   iii.  What information was used to calculate EBITDA forward multiples in the *Selected Transactions Analysis*.
>
>   iv.  What criteria was used for determining to use the multiples of 7.50x to 9.50x 2009 EBITDA in the *Selected Transactions Analysis*.
>
>   v.  Provide multiples broken down by time period and size of transaction for each transaction in the *Selected Transactions Analysis*.

66.    The Registration Statement is also deficient and should provide, *inter alia*, the following:

>   i.  How the discount rates of 13.5 percent to 15.9 percent were calculated in the *Discounted Cash Flow Analysis*.
>
>   ii.  How the terminal multiples ranging from 6.0x to 7.5x estimated EBITDA for fiscal year ending December 31, 2012 were calculated in the *Discounted Cash Flow Analysis* when the mean and median enterprise value for 2011 EBITDA of selected companies was calculated at 5.0x and 5.1x, respectively.
>
>   iii.  A description of the stand-alone, unlevered, after-tax, cash flows used in the *Discounted Cash Flow Analysis*.
>
>   iv.  Provide detail from the forecasts (sales, expenses, capital investment, cash flow, income taxes) in the *Discounted Cash Flow Analysis*.
>
>   v.  Were there any forecasts available that extended beyond 2012 in the *Discounted Cash Flow Analysis*.

67.    The Registration Statement is also deficient and should provide, *inter alia*, the following:

21

i. How much value did Boots anticipate from the proposed financial and business arrangements of a transaction pursuant to which Boots would acquire Halliburton's HWO business. (p.35).

ii. Did the board consider other potential acquisitions.

iii. In August 2009, what were the discussions that the board had, if any, concerning, among other things, the current acquisition environment, including premiums being paid in publicly announced transactions among oil field service companies. (p.35-36).

iv. In August 2009, what was the basis of the Board's consensus that Boots common stock was undervalued and that current market conditions were not conducive to securing a substantial enough premium to the trading price of Boots common stock to warrant active consideration of a sale of Boots. (p.36).

v. What discussions were had amongst the Board regarding other potentially interested parties and the likelihood of securing a superior transaction by approaching other potential acquirers or initiating an auction process, if any. If so, were these discussions held with financial advisors.

vi. During a January 15, 2010, Board meeting, what was the basis for the statement Boots had limited opportunities for internally generated organic growth, complementary acquisitions and other strategic international growth opportunities, which limitations were due, in part, to the limited number of suitable acquisition opportunities, Boots' limited capital resources and the trading price of its common stock.

vii. During the January 15, 2010 meeting, what was the basis for the statement that Boots common stock traded at a discount to its peer group, despite efforts by Messrs. Winchester and Baetz to raise its profile. Additionally, how did they attempt to raise the Company's profile. (p.37)

viii. Did the Board seek advice from outside financial advisors prior to February 24, 2010. If so, for what purpose.

68.     It is absolutely necessary for shareholders to receive a Registration Statement that provides all material disclosures related to the sales process in order for shareholders to be able to cast a fully informed decision regarding the Proposed Transaction.

22

69. By virtue of their positions as directors and senior officers of the Company, the Director Defendants have access to and knowledge of Boots's internal financial information which reveals the true financial and operating condition and prospects of the Company, and have shared such information with Halliburton. Defendants are using this information to benefit themselves at the expense and to the detriment of Boots and the public shareholders.

70. Moreover, the Director Defendants are motivated by their desire to secure personal benefits as a result of the Proposed Transaction. Specifically, certain directors stand to reap tens, if not hundreds, of millions of dollars of personal benefits at the expense of the Company and its public shareholders if the Merger is consummated, including the right to receive change-in-control benefits (such as the acceleration of their stock options), thus putting their own personal financial interests irreconcilably in conflict with the interests of the Company and its public shareholders.

71. The Director Defendants' actions in proceeding with the Proposed Transaction are wrongful, unfair, and harmful to Boots' public stockholders, and will deny them their right to share proportionately in the true value of Boots' valuable assets, profitable business, and future growth in profits and earnings. The Director Defendants have breached their fiduciary duties to Boots shareholders by causing the Company to enter into the Merger Agreement that provides for the sale of Boots at an inadequate price, and deprives Boots' public shareholders of maximum value to which they are entitled.

72. The Director Defendants' actions in proceeding with the Proposed Transaction are wrongful, unfair, and harmful to Boots' public stockholders, and will deny them their right to share proportionately in the true value of Boots' valuable assets, profitable business, and future growth in profits and earnings. The Individual Defendants have breached their fiduciary duties to Boots shareholders by causing the Company to enter into the Merger

23

Agreement that provides for the sale of Boots at an inadequate price, and deprives Boots' public shareholders of maximum value to which they are entitled.

73. Plaintiff has no adequate remedy at law.

## COUNT ONE

### Breach of Fiduciary Duty Against the Director Defendants

74. Plaintiff adopts by reference as if set forth fully herein each of the foregoing allegations.

75. The Director Defendants have violated the fiduciary duties of care to the public stockholders of Boots.

76. Plaintiff will suffer irreparable injury as a result of the Director Defendants' actions.

77. Unless enjoined by this Court, the Director Defendants will continue to breach their fiduciary duties owed to plaintiff and may consummate the Proposed Transaction to their irreparable harm.

78. Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## COUNT TWO

### Breach of Fiduciary Duty – Disclosure (Against Director Defendants)

79. Plaintiff repeats all previous allegations as if set forth in full herein.

80. The fiduciary duties of the Board in the circumstances of the Proposed Transaction require it to disclose to Plaintiff all information material to the decisions confronting Boots' shareholders.

81. As set forth above, the Board has breached its fiduciary duty through materially inadequate disclosures and material disclosure omissions.

24

82.     As a result, Plaintiff is being harmed irreparably.

83.     Plaintiff has no adequate remedy at law.

### COUNT THREE

### Aiding And Abetting Against Defendant Halliburton

84.     Plaintiff incorporates by reference as if fully set forth herein each of the foregoing allegations.

85.     Defendant Halliburton has knowingly aided and abetted the breaches of fiduciary duty committed by the Director Defendants to the detriment of Boots's public shareholders.  Indeed, the Proposed Transaction could not take place without the active participation of defendant Halliburton, who will be unjustly enriched absent relief in this action.

### COUNT IV

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

1.     Plaintiff repeats all previous allegations as if set forth in full herein.

2.     Defendants have issued the Registration Statement with the intention of soliciting shareholder support of the Proposed Transaction.

3.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

4.     Specifically, the Registration Statement violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have know that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

25

5.      The misrepresentations and omissions in the Registration Statement are material to Plaintiff and Plaintiff will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

**WHEREFORE**, plaintiff demands judgment against the Defendants jointly and severally as follows:

A.      Enjoining preliminarily and permanently, the proposed Merger under the terms presently proposed;

B.      To the extent, if any, that the transaction or transactions complained of are consummated prior to the entry of this Court's final judgment, rescinding such transaction or transactions or granting rescissory damages;

C.      Directing that Defendants account to plaintiff for all damages caused to them and account for all profits and any special benefits obtained by defendants as a result of their unlawful conduct;

D.      Awarding the plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of plaintiff's attorneys and experts; and

E.      Granting plaintiff such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 25, 2010                        Respectfully submitted,


**THE BRISCOE LAW FIRM, LLP**


_____

Willie Briscoe, Esq.
8117 Preston Road, Suite 300
Dallas, Texas 75225
*Liaison Counsel for Plaintiff George S. Brody*


**LEVI & KORSINSKY, LLP**
Joseph Levi,
(to be admitted *pro hac vice*)
*jlevi@zlk.com*
Juan E. Monteverde,
(to be admitted *pro hac vice*)
*jmonteverde@zlk.com*
Shannon L. Hopkins,
(to be admitted *pro hac vice*)
*shopkins@zlk.com*
30 Broad Street, 15th Floor
New York, NY 10004
(212) 363-7500
(212) 363-7171

*Counsel for Plaintiff George S. Brody*